UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
JUN 30 2008
RONALD A. GUZMAN, JUDGE
UNITED STATES DISTRICT COURT

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | No. 07 CR 799 |
| vs. | ) | |
| | ) | Judge Ronald A. Guzman |
| JONG KYUN CHAE, a/k/a/ "Big John" | ) | |

## PLEA AGREEMENT

1.  This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and defendant JONG KYUN CHAE, and his attorney, JEFFREY S. WEINER, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(C), as more fully set forth below. The parties to this Agreement have agreed upon the following:

### Charges in This Case

2.  The indictment in this case charges defendant with conspiracy to knowingly and intentionally distribute and possess with intent to distribute controlled substances, namely, more than 500 grams of mixtures containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, and quantities of 3,4-methylenedioxymethamphetamine (commonly known as "Ecstasy" or "MDMA"), a Schedule I Controlled Substance, and mixtures containing marijuana, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2 (Count One); and conspiracy to knowingly and intentionally to import into the customs territory of the United States from a place outside the United States, namely,

Canada, controlled substances, namely, more than 500 grams of mixtures containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, and quantities of MDMA, a Schedule I Controlled Substance, and mixtures containing marijuana, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Sections 952(a) and 960, all in violation of Title 21, United States Code, Section 963, and Title 18, United States Code, Section 2 (Count Two).

3. Defendant has read the charges against him contained in the indictment, and those charges have been fully explained to him by his attorney.

4. Defendant fully understands the nature and elements of the crimes with which he has been charged.

### Charge to Which Defendant is Pleading Guilty

5. By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to Count One of the indictment. Count One charges defendant with conspiracy to distribute and possess with intent to distribute controlled substances, namely, more than 500 grams of mixtures containing a detectable amount of methamphetamine and MDMA, and mixtures containing marijuana, in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

### Factual Basis

6. Defendant will plead guilty because he is in fact guilty of the charge contained in Count One of the indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt and constitute relevant conduct under Guideline § 1B1.3:

Beginning in or about November 2003, and continuing until in or about Summer 2004, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, JONG KYUN CHAE, a/k/a "Big John," defendant herein, conspired with the co-defendants in this case and others to knowingly and intentionally possess with the intent to distribute and distribute controlled substances, namely, more than 500 grams of mixtures containing a detectable amount of methamphetamine, a Schedule II Controlled Substance, and quantities of MDMA, a Schedule I Controlled Substance, and mixtures containing marijuana, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 2.

In particular, prior to November 2003, CHAE and Sejin Oh had been partners engaged in the distribution of marijuana in the Chicago area. During the Summer of 2003, CHAE and Sejin Oh met with co-defendants Thomas Man Lung Lo (known to CHAE as "Tommy") and Yong Ouyang (known to CHAE as "Alun") at a prostitution house in the Chinatown neighborhood in Chicago to discuss the possibility of obtaining for resale large amounts of MDMA and hydroponic marijuana from a Canadian drug source known to Yong Ouyang ("Ouyang"). Sejin Oh and CHAE agreed to meet the Canadian drug dealers.

Thereafter, in approximately October 2003, Sejin Oh and CHAE met with co-defendant Ju Wen Zhou (known to CHAE as "Goi"), who introduced himself to Sejin Oh and CHAE as one of the Canadian drug dealers who could supply MDMA and hydroponic marijuana to Sejin Oh and CHAE. Thomas Man Lung Lo ("Lo"), who speaks Chinese and English, served as the interpreter for the meetings between Sejin Oh/CHAE and Zhou. Sejin Oh handled most of the discussions with Zhou. Sejin Oh informed CHAE that Zhou

would sell to Sejin Oh and CHAE both MDMA for $3-$4 per pill and hydroponic marijuana for $2,700 per pound.

In November 2003, Sejin Oh and CHAE traveled to Toronto, Canada with Lo and Ouyang in order to obtain a sample of MDMA and hydroponic marijuana from Zhou. At a hotel in Toronto, Zhou gave to Sejin Oh and CHAE approximately 20 MDMA pills and a few grams of marijuana as samples. Zhou again explained that he would charge Sejin Oh and CHAE the price of $3-$4 per MDMA pill and $2,700 per pound of hydroponic marijuana. Sejin Oh and CHAE then smuggled the samples from Zhou into the United States. Upon their return to the United States, Sejin Oh and CHAE gave the samples to co-defendant Jorge Huerta (known to CHAE as "Jorge") because Jorge Huerta ("Huerta") was expected to be their primary drug purchaser.

Within a few days of returning from Canada in November 2003, Sejin Oh, after conferring with CHAE, called Zhou and ordered 10,000 MDMA pills and 20-30 pounds of marijuana. Zhou charged Sejin Oh $4 per MDMA pill and $2,700 per pound of marijuana.

At the end of November 2003, Zhou came to Chicago with the drugs. Zhou delivered the drugs to Sejin Oh and CHAE inside Sejin Oh's apartment at 5415 North Sheridan Road in Chicago. The MDMA pills numbered approximately 12,000 and bore two logos. In addition, Zhou delivered approximately 25-30 pounds of hydroponic marijuana to CHAE and Sejin Oh, in the presence of Lo. The drugs were all packaged in clear heat sealed bags. It became clear to CHAE from the conversation that Zhou was not just a courier and, in fact, that Sejin Oh and CHAE were buying the drugs from Zhou. Zhou fronted the drugs to Sejin Oh and CHAE, meaning that they received the drugs on credit, with the expectation that payment for the drugs would be made from the proceeds obtained

from resale of the drugs. The total debt owed to Zhou for the drugs exceeded $70,000.

After obtaining the drugs, Sejin Oh and CHAE then sold the drugs to various customers at a profit. In particular, Sejin Oh and CHAE sold approximately 8,000 of the MDMA pills to Huerta and the remaining MDMA pills to Ouyang and Lo. All of the MDMA pills were sold for $6-$7 each. Most of the marijuana was also sold to Huerta. The marijuana was sold for about $2,900-$3,000 per pound. While Sejin Oh and CHAE sold the drugs, they kept the remaining drugs at an apartment on North Western Avenue in Chicago that was rented by co-defendant Jung Bae ("Bae"). Sejin Oh told CHAE that Sejin Oh was paying Bae in marijuana for Bae's use of the apartment. After selling the drugs to the various customers, Sejin Oh and CHAE repaid Zhou approximately $40,000, which left them with a remaining drug debt to Zhou of approximately $30,000. Sejin Oh and CHAE could not make full repayment because they had spent a substantial portion of the drug proceeds prior to making the partial payment of $40,000 to Zhou.

In approximately the middle of December 2003, Sejin Oh, CHAE, Lo and Ouyang traveled to Toronto and met with Zhou to discuss their existing debt. However, Zhou refused to front any more drugs to Sejin Oh and CHAE. Later attempts by Sejin Oh in late 2003 to get Zhou to change his mind were unsuccessful.

In January 2004, Sejin Oh and CHAE agreed to sell 10,000 MDMA pills to two new customers who, unbeknownst to them, were two undercover officers ("UCOs") from the DuPage County Sheriff's Office. At the time, co-defendants Melvin Dumanlang ("Dumanlang"), Carlo Panadero and Carlos Panadero Jr. were also participating with Sejin Oh and CHAE in the drug trafficking operation. Sejin Oh and Carlo Panadero primarily handled the negotiations with the UCOs. Later, in February 2004, Dumanlang traveled to

Canada to get a sample of the MDMA pills that they intended to sell to the UCOs. Dumanlang then smuggled the sample of MDMA pills back into the United States by secreting the MDMA pills on his person. Sejin Oh thereafter gave those MDMA pills to the UCOs as a sample of the pills that Sejin Oh and his "crew" could sell to the UCOs. Those pills were later determined by laboratory testing to contain both MDMA and methamphetamine. The deal ultimately did not go through due to concerns by Sejin Oh about a possible investigation against his crew by the United States Secret Service and Sejin Oh's inability to convince Zhou to provide another shipment of MDMA.

Thereafter, in approximately March 2004, Sejin Oh and CHAE began purchasing large amounts of hydroponic marijuana from another person, Individual B, who had been Zhou's driver during some of the prior meetings between Zhou, Sejin Oh, CHAE and Lo concerning the trafficking of MDMA and hydroponic marijuana. For a period of time, Sejin Oh and CHAE partnered in the purchase of hydroponic marijuana from Individual B, but, following a dispute over money with Sejin Oh, CHAE eventually began to deal directly with Individual B. Based upon his discussions with Lo, CHAE was also aware that Lo was purchasing hydroponic marijuana from Individual B. In total, CHAE purchased approximately 200 pounds of hydroponic marijuana from Individual B. The hydroponic marijuana was usually fronted to CHAE by Individual B and delivered to CHAE in the Chicago area by co-defendant Yvonne Law or another one of Individual B's couriers. After selling the hydroponic marijuana, CHAE usually paid for the marijuana by delivery of drug proceeds to Yvonne Law or another one of Individual B's couriers.

The amount of drugs that the government can prove to have been involved in CHAE's offense was approximately 3,000 grams of mixtures containing MDMA, 2,500

grams of mixtures containing methamphetamine and approximately 90.9 kilograms of marijuana.

7. Defendant disclosed the following self-incriminating information to the government pursuant to the terms of a proffer agreement. Pursuant to Guideline §1B1.8(a), this information may not be used in determining the applicable guideline range for defendant:

In approximately February 2004, Sejin Oh and CHAE met with Individual B to discuss the purchase of both MDMA and hydroponic marijuana by Sejin Oh and CHAE from Individual B. At that meeting, Sejin Oh and CHAE, working as partners, placed an order for 30 pounds of hydroponic marijuana and 10,000 MDMA pills. Sejin Oh and CHAE agreed to buy the marijuana for $2,700 per pound and the MDMA pills for $3-$4 per pill.

In March 2004, Individual B came to Chicago with approximately 8,000 MDMA pills and 25 pounds of hydroponic marijuana, which Individual B fronted to Sejin Oh and CHAE. Individual B delivered the drugs to Sejin Oh and CHAE at Sejin Oh's apartment at 5415 North Sheridan Road in Chicago. Sejin Oh and CHAE then sold the drugs to various people, including Huerta and various south side gang members.

After about three days, Individual B returned to Canada. By then, Sejin Oh and CHAE had sold most of the drugs and had paid Individual B for most of the delivery. The drugs were stored at both Sejin Oh's apartment and in Bae's apartment. After selling the remainder of the drugs, Sejin Oh and CHAE paid Individual B by delivering money to people in Chinatown associated with Individual B.

In Summer 2004, CHAE loaned $17,000 to Sejin Oh so that Sejin Oh could pay off a drug debt and obtain another shipment of drugs. Sejin Oh intended to partner with Ivan

Myint, whom CHAE knew to be a large scale drug dealer on the north side of Chicago. Sejin Oh and CHAE later met co-defendant Kenneth Quoc Luong (known to CHAE as "Kenny") in Chinatown to talk about possible drug deals in the future. During this same time, Sejin Oh and CHAE, as partners once again, were selling hydroponic marijuana to Ivan Myint.

8. The foregoing facts in Paragraphs 6 and 7 above are set forth solely to assist the court in determining whether a factual basis exists for defendant's plea of guilty and to identify statements made subject to Guideline § 1B1.8(a), and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crime and related conduct.

### Maximum Statutory Penalties

9. Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a. A maximum sentence of life imprisonment, and a statutory mandatory minimum sentence of 10 years' imprisonment. Pursuant to Title 18, United States Code, Section 3561, defendant may not be sentenced to a term of probation for this offense. This offense also carries a maximum fine of $4,000,000. Defendant further understands that the judge also must impose a term of supervised release of at least five years, and up to any number of years, including life.

b. In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty imposed.

## Sentencing Guidelines Calculations

10. Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

11. For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

    a. **Applicable Guidelines.** The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2007 Guidelines Manual.

    b. **Offense Level Calculations.**

        i. Pursuant to Guideline §§ 2D1.1(a)(3) and (c)(3), the base offense level is 34 because defendant's offense including relevant conduct involved approximately 3,000 grams of mixtures containing MDMA, 2,500 grams of mixtures containing MDMA and methamphetamine, and approximately 90.9 kilograms of marijuana, which, pursuant to Guideline § 2D1.1(c) (drug equivalency table), is equivalent to approximately 7,590.9 kilograms of marijuana.

        ii. Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline

§ 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine that may be imposed in this case, a two-level reduction in the offense level is appropriate.

    iii.    In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

    iv.    Based on the evidence now known to the government, the parties agree, subject to the Court's approval, that Guideline § 5C1.2 and Title 18, United States Code, Section 3553(f), are applicable, and that the Court shall impose a sentence without regard to any statutory minimum sentence, and the offense level shall be reduced by two levels, pursuant to Guideline § 2D1.1(b)(11).

    c.    **Criminal History Category.** With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government and stipulated below, defendant's criminal history points equal zero and defendant's criminal history category is I based upon following:

    i.    On or about February 20, 1996, defendant was convicted in the Circuit Court of LaSalle (96 CM 136) of criminal trespass to State land and sentenced to one year supervision, resulting in zero criminal history points under Guideline § 4A1.2(c)(1).

d.  **Anticipated Advisory Sentencing Guidelines Range.** Therefore, based on the facts now known to the government, the anticipated offense level is 29, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory Sentencing Guidelines range of 87 to 108 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose. Defendant also acknowledges that he is subject to a statutory minimum sentence of 10 years' imprisonment, if the Court determines that it applies.

e.  Defendant and his attorney and the government acknowledge that the above Guideline calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional Guideline provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

f.  Both parties expressly acknowledge that this plea agreement is not governed by Fed.R.Crim.P. 11(c)(1)(B), and that errors in applying or interpreting any of the Sentencing Guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of

the Guidelines. The validity of this Plea Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Plea Agreement, on the basis of such corrections.

### Cooperation

12. Defendant agrees he will fully and truthfully cooperate with the United States Attorney for the Northern District of Illinois in any matter in which he is called upon to cooperate. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil or administrative proceeding. Only the United States Attorney for the Northern District of Illinois may require defendant's cooperation pursuant to this Plea Agreement. Defendant agrees to the postponement of his sentencing until after the conclusion of his cooperation.

### Agreements Relating to Sentencing

13. At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this plea agreement, then the government shall move the Court, pursuant to Guideline § 5K1.1 and 18 U.S.C. § 3553(e), if applicable, to depart downward from the applicable guidelines range, and the parties jointly shall recommend a sentence of 66 percent of the low end of the applicable guidelines range or the statutory minimum sentence, if it applies, whichever is greater. Defendant understands that the decision to depart from the applicable guidelines range and statutory minimum sentence, if it applies, rests solely with the Court.

14. If the government moves the Court, pursuant to Sentencing Guideline § 5K1.1 and 18 U.S.C. § 3553(e), if applicable, to depart from the applicable Guideline range and the statutory minimum sentence, if applicable, as set forth in the preceding paragraph, this Agreement will be governed, in part, by Federal Rule of Criminal Procedure 11(c)(1)(C). That is, the parties have agreed that the sentence imposed by the Court shall include a term of imprisonment in the custody of the Bureau of Prisons of 66 percent of the low end of the applicable guidelines range or the statutory minimum sentence, if it applies, whichever is greater. Other than the agreed term of incarceration, the parties have agreed that the Court remains free to impose the sentence it deems appropriate. If the Court accepts and imposes the agreed term of incarceration set forth, defendant may not withdraw this plea as a matter of right under Federal Rule of Criminal Procedure 11(d) and (e). If, however, the Court refuses to impose the agreed term of incarceration set forth herein, thereby rejecting this plea agreement, or otherwise refuses to accept defendant's plea of guilty, either party has the right to withdraw from this plea agreement.

15. If the government does not move the Court, pursuant to Sentencing Guideline § 5K1.1 and 18 U.S.C. § 3553(e), if applicable, to depart from the applicable Guideline range and the statutory minimum sentence, if applicable, as set forth above, this plea agreement will not be governed, in any part, by Federal Rule of Criminal Procedure 11(c)(1)(C), the preceding paragraph of this plea agreement will be inoperative, and the Court shall impose a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines, and the statutory minimum sentence, if it applies, without any downward departure for cooperation pursuant to § 5K1.1. Defendant may not withdraw his plea of guilty because the government has failed to make

a motion pursuant to Sentencing Guideline §5K1.1 and 18 U.S.C. § 3553(e), if applicable.

16. Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

17. After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining count of the indictment and the forfeiture allegation as to this defendant.

## Presentence Investigation Report/Post-Sentence Supervision

18. Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope and extent of defendant's conduct regarding the charges against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to the issue of sentencing, including the nature and extent of defendant's cooperation.

19. Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001, or as a contempt of the Court.

20. For the purpose of monitoring defendant's compliance with his obligations to pay a fine during any term of supervised release to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release to which defendant is sentenced. Defendant also agrees that a certified copy of this Plea Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

### Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Plea Agreement

21. This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 07 CR 799.

22. This Plea Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver or release by the United States or any of its agencies of any administrative or judicial civil claim, demand or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities, except as expressly set forth in this Agreement.

## Waiver of Rights

23. Defendant understands that by pleading guilty he surrenders certain rights, including the following:

  a. **Trial rights.** Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

   i. The trial could be either a jury trial or a trial by the judge sitting without a jury. Defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

   ii. If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

   iii. If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

    iv. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

    v. At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

    vi. At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

    vii. At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

  b. **Waiver of appellate and collateral rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 18, United States Code, Section 3742, affords a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, if the government makes a motion at sentencing for a downward departure pursuant to Sentencing Guideline § 5K1.1 and 18 U.S.C. § 3553(e), defendant knowingly waives the right to appeal his conviction and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and

fine within the maximums provided by law, and including any order of restitution or forfeiture, in exchange for the concessions made by the United States in this Plea Agreement. In addition, defendant also waives his right to challenge his conviction and sentence, and the manner in which the sentence was determined, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation.

c. Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

### Other Terms

24. Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

### Conclusion

25. Defendant understands that this Plea Agreement will be filed with the Court, will become a matter of public record and may be disclosed to any person.

26. Defendant understands that his compliance with each part of this Plea Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate

the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

27. Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Plea Agreement to cause defendant to plead guilty.

28. Defendant acknowledges that he has read this Plea Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: 6-30/2008

PATRICK J. FITZGERALD
United States Attorney

JONG KYUN CHAE
Defendant

TIMOTHY J. CHAPMAN
Assistant United States Attorney

JEFFREY S. WEINER
Attorney for Defendant